Nickerson, Gary A., J.
These actions arise from a written agreement involving real estate in Dennis, Massachusetts, and were consolidated for trial in the Superior Court. The case was tried jury-waived, as to liability only, over the course of six days from December 13, 2004, through December 20, 2004. The parties completed their post-trial submissions on April 8, 2005. Based on the credible evidence, the Court enters the following findings of fact.
FINDINGS OF FACT
In the 1970s, Lacy M. Hayes owned a parcel of land at the southwest corner of the intersection of Routes 134 and 6A in the village of East Dennis. On August 10, 1973, Mrs. Hayes entered into a long-term lease of the premises to the Gulf Oil Corporation. (Ex. 1.) Gulf Oil operated a gasoline service station on the site, a use which continues to this day. Apparently during Gulf Oil’s tenancy, gasoline leaked from an on-site storage tank, leading to a major environmental cleanup effort on the premises. Gulf Oil, in due course, became Chevron U.S.A., Inc. As Chevron, the lessee assigned its rights under the 1973 document to the defendant Cumberland Farms, Inc., effective April 22, 1986. (Ex. 10.) Mrs. Hayes executed trust documents, creating the defendant Lacy M. Hayes Revocable Trust on April 15, 1992, and on the same date, conveyed her ownership interest in the premises to the Trust. (Ex. 23.) While Lacy Hayes appeared on the recorded documents, the day-to-day business of the Trust was handled by her husband, Robert Hayes. At all times pertinent to this action, Robert was authorized to act as the agent for the Trust.
The Gulf Oil lease governed the relationship between the Trust and Cumberland Farms. Pursuant to Paragraph (5) of the document, the lease period was fifteen years with options exercisable by the lessee to extend the lease for two additional terms of five years each. Paragraph (8) of the lease set a start date for the initial fifteen-year term as being one hundred twenty days after receipt of notice from the landlord that the landlord had removed existing buildings from the land, but in no event was the start date to extend beyond January 30, 1974. Within the 1973 Gulf Oil lease was a provision, at Paragraph (22), granting the tenant “the preferential right to buy the leased premises in the event Lessor wishes to sell it.” The provision was triggered whenever, “during the term of the lease,” Lessor received “one or more bonafide offers to purchase” the premises from third parties. As the initial fifteen-year lease period drew to a close, Cumberland Farms exercised its option to renew the lease for five years.
Robert Hayes was and is a gregarious man, a professional driving instructor, but nonetheless skilled in business and real estate matters. From time to time he was a customer at the Speedway gas station in Harwich, a station owned and operated by plaintiff Cape Oil Delivery, Inc. The principal of Cape Oil Delivery, Inc. was and is Robert E. Romano, a gentleman schooled in business management and experienced in the retailing of heating oil and gasoline. By early summer of 1992, Cumberland Farms was giving *482 the Trust every indication that the lease would expire without the lessee exercising the final five-year option. Cumberland Farms had stopped paying rent. Late in June or early July 1992, Robert Hayes struck up a conversation with Romano when Hayes was buying gas at the Harwich station. Hayes told Romano that Cumberland Farms was not paying its rent and Hayes asked if Romano was interested in the site.
The next day, Romano, accompanied by his attorney, Glenn Shealey, toured the site with Robert Hayes. The men returned to the adjacent lot, the site of Hayes’s residence. Hayes said he wanted at least $800,000 for the property. Romano said that was too much given the price of other gas stations on the market. Hayes gave Romano a copy of the 1973 lease. They parted company on a note of cooperation except for Hayes’ comment that he didn’t like lawyers.
A week later, Romano and Hayes met again at Hayes’s house. Mrs. Hayes signed a letter granting Romano permission to speak with the contractor handling the still ongoing environmental cleanup of the site. Mr. Hayes and Romano talked price as to a lease or a purchase. Hayes telephoned Roger Humphrey, Cumberland Farms’ property manager, in Romano’s presence, leaving Romano -with the impression that Cumberland Farms was going to relinquish the site. The men agreed to meet with Hayes’s attorney, Charles Crowell.
Within days, Hayes, Crowell, Romano, and Shealey met at Crowell’s office. Crowell encouraged Hayes and Romano to thrash out the details of a deal between them. Hayes and Romano continued their discussions across Hayes’s kitchen table. Heated words were exchanged, but after they had a soda together, they parted amicably. A few days later, Romano returned offering to purchase the site. Hayes said no to a sale but offered a lease at $1,500 per month.
Romano took Hayes’s lease offer to heart. He drafted a document (Ex. 4), which has been referred to in the course of the litigation as the Agreement or the Cape Oil Agreement, and presented it to Hayes, together with a $1,000 deposit check, on July 30, 1992. Lacy Hayes signed the Agreement as Trustee and accepted the $1,000. The Agreement is short, slightly more than a single page written in a straightforward manner. The Agreement purports to be a lease for “the gas station property at the comer of Route 6A & Rte. 134.” The lease period is for fifteen years, expressed as “three five year leases” apparently to facilitate the cost-of-living adjustment to be made every five years. Rent is set for the first five years at $1,500 per month, with the tenant assuming all taxes, utilities, and operating costs. After the first two years, the Agreement grants Cape Oil the option to purchase the premises for $275,000, with financing terms as therein specified. The Agreement calls for Cape Oil to take possession “within 7 seven days of the earlier present lessee (Cumberland/Gulf) vacating the premises or the expiration of its leasehold pursuant to the present lease.”
Shortly after July 30th, Hayes and Romano met again, with their attorneys present, to discuss the transfer of the tenancy to Cape Oil. Hayes’s counsel took the position that the Agreement was an offer to purchase the gas station, something that Cumberland Farms was entitled to know per the Gulf Oil lease. Romano’s counsel contended that the Agreement was a lease, and as such, there was no obligation on the part of Hayes to give notice to Cumberland Farms. Robert Hayes promptly provided a copy of the Agreement to Cumberland Farms.
In the summer of 1992, Cumberland Farms gave all involved the impression that it would be vacating the premises. During 1992, Cumberland Farms was operating under the protection of the Bankruptcy Court, hence the overdue rent. The reorganization also led to the tenant being less than definitive in signaling its intentions vis-a-vis the lease. For example, on August 5, 1992, Humphrey, on behalf of Cumberland Farms, drafted and forwarded to Robert Hayes lease termination documents, including a draft bill of sale transferring all equipment and fixtures installed by the tenant on the premises to Mrs. Hayes. After the rush of Labor Day visitors to Cape Cod, Cumberland Farms closed the gas station, but in a contrary move, the firm resumed rent payments to Hayes. Meanwhile, Romano and Hayes prepared for the new tenancy.
Throughout the course of his negotiations with Hayes, Romano was aware of the environmental cleanup work at the site. Before drafting the Agreement, Romano met with the Department of Environmental Protection’s engineers. Based on all he learned, Romano concluded there was no environmental downside to Cape Oil’s assumption of the site. Based on their discussions, both Romano and Hayes assumed that Cape Oil would maintain insurance to the industry standard of one million dollars as a bulwark against future environmental damage.
By a cover letter dated September 21, 1992, Attorney Shealey forwarded to Attorney Crowell a draft commercial lease incorporating the terms of the Agreement. (Ex. 19.) The draft lease included numerous provisions not found in the Agreement primarily addressing environmental concerns and the condition of equipment on the premises. Nonetheless, the draft lease did not depart from the intent and understanding of Hayes and Romano as of July 30, 1992. Both men understood that Chevron was responsible for the past environmental damage and that Cape Oil would be responsible for any future damage. Both men understood that the existing tanks were to be tested for tightness and left in the ground at the end of Cumberland Farms’ tenancy. Both men understood that Cape Oil would be responsible for replacing any deficient equipment. In short, their Agreement and the draft commercial lease were premised on the parties’ accep *483 tance of usual industry methods and standards. There were changes in the draft lease — in particular, provisions for the decrease in rents in the event of deflation in the economy and for the early termination of the lease, which the Agreement did not contemplate. The draft commercial lease was not presented on a take-it-or-leave-it basis. Romano and his counsel expected the draft would serve as the basis for both sides to craft the finished lease in recordable form. Surely the draft lease was intended to fine tune the Agreement, but it was not intended to displace it.
One aspect of Shealey’s letter of September 21st deserves particular comment. On the second page of the letter, it was stated that “Provided the site passes a- satisfactory 2 IE engineering review, my client is willing to enter into the Lease we have been discussing now for some time.” The import of that sentence should not be exaggerated. It simply confirmed the assumption that Hayes and Romano were operating on, i.e., the site was fit for continued use as a gas station. It was not a repudiation of the Cape Oil Agreement. Moreover, based on the exhibits and credible evidence at hand, neither Hayes nor Attorney Crowell gave voice or letter during 1992 or 1993 to protest the contents of the cover letter or suggest changes in the draft commercial lease. Their absence of protest leads this jurist to infer that they were content with Attorney Shealey’s efforts.
In any event, the efforts of counsel came to naught, for in April 1993, Cumberland Farms reopened the gas station and exercised its option to extend the 1973 lease for the final five-year period. When informed of Cumberland Farms’ actions, Romano told Hayes that he still wanted the site when the five-year extension expired. The Cape Oil Agreement was moth-balled, but not forgotten. For Hayes, the Agreement had already served a valuable purpose as the whip to goad Cumberland Farms into resuming rent payments. Moreover, Hayes liked the security of having a default tenant in the form of Romano. From time to time, between April 1993 and March 1998, Hayes and Romano spoke, each referencing their continued interest in implementing their 1992 Agreement.
In March 1998, Romano wrote to Hayes expressing his interest in purchasing the site when Cumberland Farms’ lease expired in April 1998. (Ex. 10.) Hayes telephoned Romano to say the lease had another year to run and that his interest was still in renting the site. The two men met occasionally over the summer of 1998 and casually reaffirmed their Agreement. During the 1990s, the Hayeses were in the habit of wintering in Florida. Late in January 1999, Mr. Hayes telephoned Romano and asked if he still wanted the station. Romano said yes, and the two agreed to meet when Hayes returned from Florida.
During the first week of March 1999, most likely on March 2nd, Hayes, Romano, and Romano’s mother met at the Cape Oil office. Romano’s mother was, in her own right, a savvy businesswoman, there to advise her son. Romano entered the meeting seeking to reaffirm the Agreement and secure its terms in a lease in recordable form. Hayes sought assurance that there would be no prepayment under the Agreement’s mortgage provisions in the event Cape Oil exercised its right to buy the premises. Hayes was looking to maintain a steady stream of income during he and his wife’s retirement years. After conferring with his mother, Romano agreed to no prepayment. Hayes told mother and son that Cumberland Farms would be off the site by April 15th or 20th. Hayes said he’d have Attorney Crowell draft a formal document reflecting the terms of the Agreement in recordable form.
Hayes’s conduct at the meeting was disingenuous inasmuch as he had actually been engaged in negotiations with Cumberland Farms since November 1998 • .to either extend the Gulf Oil lease or sell the premises outright. For many years there existed a competing gas station directly across from the Hayes’s property on Route 6A. By September 1998, the competition had closed its doors and Cumberland Farms’ executives were favorably considering extending their lease or buying the Hayes property outright. By mid-November, the corporation’s property managers had opened discussions with Hayes. (Ex. 28.) Hayes expressed his desire to sell the gas station, preferably to Cumberland Farms. Cumberland Farms preferred an extension of their lease. As of March 4, 1999, Hayes had in hand a lease/option-to-purchase offer from Cumberland Farms that mirrored the Cape Oil Agreement but was more lucrative for Hayes. (Ex. 18.)
The day after their meeting, Hayes telephoned Romano to say that he was obligated to provide Cumberland Farms with notice of the Agreement. Romano voiced his disagreement on that point to Hayes. Their respective positions mirrored the positions of their attorneys, for the attorneys had disagreed on this point ever since their first meeting in the summer of 1992. In this instance, Hayes was yet again using the Agreement to goad Cumberland Farms into action. Hayes had provided Cumberland Farms with a copy of the Agreement on several occasions before March 1999.
Despite having full knowledge of the Agreement since 1992, Cumberland Farms had, prior to March 1999, taken no steps to buy the site. During the first few months of 1993, Cumberland Farms had studied the merits of buying the property and, as of April 30, 1993, had reached a decision not to do so (Exs. 25, 27). This state of affairs changed after Hayes rejected the March 4, 1999 lease/option-to-purchase offer. In quick order, Hayes and Cumberland Farms entered into negotiations for the outright sale of the premises which culminated in Cumberland Farms’ self-serving letter of April 9, 1999. In the letter, Attorney Anastas, in-house counsel to Cumberland Farms, stated that her firm had received notice on March 3, 1999 of Cape *484 Oil’s offer to purchase and that Cumberland Farms was exercising “its right of first refusal to purchase the premises on the same terms and conditions, as that right is set forth in Paragraph 22 of the Lease between us dated August 10, 1973.” The April 9th letter was the first document suggesting a meeting of the minds between Hayes and Cumberland Farms as to the sale of the premises to Cumberland Farms. Both the agents for Cumberland Farms and Hayes exhibited lapses in memory at trial as to the particulars of their negotiations. Under the circumstances, the Court finds that the terms for the sale to Cumberland Farms were not resolved until April 9, 1999. On April 26, 1999, the Trust deeded the premises to Cumberland Farms for a purchase price of $300,000. (Ex. 14.) Hayes had used the Agreement to best Romano’s $275,000 option price by $25,000 and an outright sale. While Hayes and Cumberland Farms negotiated their deal, Hayes strung Romano along, at first with promises of a recordable lease, and after mid-March 1999, with comments to the effect that he was unsure of Cumberland Farms’ intentions.
Throughout this saga, Romano insisted that the Cape Oil Agreement was a binding contract. That aside, he acted cautiously on the occasions when it appeared that the premises would soon be Cape Oil’s. Romano spoke with his wholesale supplier about providing gasoline to the site. He prepared cost estimates for upgrading the piping at the station and so forth. The gentleman investigated alternative financing arrangements to carry the new business. In short, he prudently prepared to take over the gas station. He did not incur actual expenses or enter into subsidiary agreements with suppliers or contractors. Attorney Shealey’s unfounded representations in Exhibit 11 aside, Cape Oil did not incur costs in reliance on the Cape Oil Agreement. The sale of Cape Oil’s South Yarmouth station was not prompted by the Agreement.
Once the deed had gone to record, Mrs. Hayes tendered to Romano the $1,000 deposit she had accepted years before to bind their Agreement. (Ex. 39.) Romano rejected the tender, saying that their Agreement was enforceable. As part of the deal with Cumberland Farms, the Trust was to be indemnified by Cumberland Farms as to the defense of any action brought by Romano and any recovexy thereon. (Ex. 34). Cumberland Farms’ General Counsel wrote a telling letter to Cape Oil’s counsel on May 5, 1999, wherein he said that his employer “exercised its leasehold right of first refusal to purchase the premises.” Moreover, counsel characterized the Cape Oil Agreement as “a valid and binding Purchase and Sale Agreement.” (Ex. 21.) The May 5th letter was in response to Cape Oil’s counsel’s letter of April 16th directed to Lacy Hayes wherein Cape Oil yet again sought to enforce the Agreement. No doubt Cumberland Farms delayed its response until after the deed was recorded on April 26th.
The precise starting date for the Gulf Oil lease has been a subject of controversy. No evidence was rendered suggesting a start date before January 30, 1974. At various times, Hayes and Cumberland Farms adhered to the notion that the start date was April 15, 1974, a notion supported only by Cumberland Farms’ counsel’s speculation set forth in Exhibit 29. In the letter which is Exhibit 29, Cumberland Farms’ property manager admits to Hayes’ counsel that confusion exists as to the precise start date for the Gulf Oil lease and further admits that she has purposefully concealed this situation from Cape Oil’s counsel. On at least one occasion, Hayes’s counsel expressed the opinion that the Gulf Oil lease expired August 31, 1993. (Ex. 25.) Romano and his counsel at various times believed the start date to be August 27, 1973, the day the lease was signed, and at other times, various latter dates, including January 30, 1974. After March 1998, Romano and his counsel appear to have acquiesced to Hayes’s belief that the lease started April 15, 1974, and therefore, after all its extensions, ended on April 15, 1999. There being no credible evidence to the contrary, the Court finds that the Gulf Oil lease commenced, under the terms of the document itself, on January 30, 1974, and that the various beliefs held by the parties to the contrary are nothing more than baseless conjecture. Ergo, the Gulf Oil lease terminated on January 30, 1999. Pursuant to Paragraph (6) of the lease Cumberland Farms had the right to holdover for a period of one month, thus Cumberland Farms enjoyed the lease’s benefits through February 28, 1999, but not beyond.
Litigation promptly followed the recording of the deed. Curiously, Cumberland Farms filed suit first, with a complaint for declaratory relief in the Land Court on May 14, 1999. Romano followed with a more broad-based action in Superior Court on July 14, 1999. The complaint in the Land Court action seeks declaratory relief as to the rights and obligations of the parties under the Gulf Oil lease and the Cape Oil Agreement. The Superior Court action is framed in seven counts: (I) for breach of contract as to the Agreement by the Hayes Trust; (II) for specific performance of the Agreement by the Hayes Trust; (III) for misrepresentation by the Hayes Trust; (IV) for promissory estoppel against the Hayes Trust; (V) for interference with contractual/business relations against Cumberland Farms; (VI) for 93A recovery against the Hayes Trust and Cumberland Farms; and (VII) for conspiracy against both defendants. A motion for summary judgment was allowed prior to trial as to the conspiracy count. The cases were consolidated for trial in the Superior Court.
APPLICATION OF THE FACTS TO THE LAW
The overarching issue in this case is whether the Trust committed a breach of contract by selling the premises to Cumberland Farms. To answer this question, one must first determine whether the Cape Oil *485 Agreement is a binding contract and then determine whether the Agreement was subservient to any rights held by Cumberland Farms pursuant to the Gulf Oil lease. Let us turn to the first subsidiary issue.
“It is axiomatic that to create an enforceable contract there must be an agreement between the parties on the material terms of that contract, and the parties must have a present intention to be bound by that agreement.” Situation Management Systems, Inc., v. Malouf, Inc., 430 Mass. 875, 878 (2000); see McCarthy v. Tobin, 429 Mass. 84, 87 (1999) Rosenfield v. United States Trust Co., 290 Mass. 210, 216 (1935) (parties’ failure to agree on material terms may indicate absence of present intent to be bound). “It is not required that all terms of the agreement be precisely specified, and the presence of undefined or unspecified terms will not necessarily preclude the formation of a binding contract.” Situation Mgmt. Sys., Inc., 430 Mass. at 878; see Lafayette Place Assocs. v. Boston Redevelopment Auth., 427 Mass. 509, 517-18 & n.9 (1998), cert denied, 525 U.S. 1177 (1999). “The parties must, however, have progressed beyond the stage of ‘imperfect negotiation.’ ” Situation Mgmt. Sys., Inc., 430 Mass. at 878; Lafayette Place Assocs., 427 Mass. at 517-18 & n.9; Rosenfield, 290 Mass. at 217 (“[a]n agreement to reach an agreement is a contradiction in terms and imposes no obligation on the parties thereto”).
“All of the essential terms of a contract must be sufficiently definite so that the nature and extent of the obligations of the parties can be ascertained. However, a contract is not to be held unenforceable ‘if, when applied to the transaction and construed in the light of the attending circumstances,’ the meaning can be ascertained with reasonable certainly.” Simons v. American Dry Ginger Ale Co., 335 Mass. 521, 523 (1957), quoting Cygan v. Megathlin, 326 Mass. 732, 734 (1951).
The Cape Oil Agreement fares well under the black-letter law set forth above. The Agreement contains the essential terms of a lease. See Kaufman v. Lennox, 265 Mass. 487, 488-89 (1929); see also McCarthy, 429 Mass. at 86-88; Simons, 335 Mass. at 523. While the premises leased is not described by metes and bounds, the description is unambiguous. The Trust owns only one “gasoline station property located at the corner of Route 6A & Rte. 134,” which has as its “present LESSEE (Cumberland/Gulf).” The description of the premises is sufficient. See Simons, 335 Mass. at 523; Cygan, 326 Mass. at 734; Michelson v. Sherman, 310 Mass. 774, 770 (1942).
The term of the lease need not be keyed to a fixed calendar date. “It is generally held to be essential to the validiiy of a lease for years that it prescribe with reasonable certainty the date of commencement and the duration of the term of the lease, but this rule does not prevent the creation of tenancies in which the term is not absolutely fixed and where the time of commencement is stated to depend upon the happening of an event. After the happening of the event any uncertainty is removed and the lease in this respect is valid.” Wunsch v. Donnelly, 302 Mass. 286, 288 (1939). Here, the Cape Oil lease depended on, and was to commence within seven days of, the earlier occurrence of two events, Cumberland’s vacating the gas station, or the expiration of Cumberland’s lease. Although the exact date of the occurrence of these events was not necessarily fixed or determinable from the Cape Oil Agreement or Gulf lease, it was absolutely certain that one of these events would occur before the other, and upon the occurrence of the earlier event the Cape Oil lease would then commence within seven days. The Agreement clearly states that rent is due the first of every month. The amount of rent is fixed at the outset and thereafter adjusts by a specified cost-of-living index. The Agreement is a “Triple-Net-Lease,” a term of art which corresponds to the remaining language of Paragraph (3) of the Agreement. See Black v. Coastal Oil New England, Inc., 45 Mass.App.Ct. 461, 463 (1998); see also United States v. Stoddard, 875 F.2d 1233, 1235 (6th Cir. 1989).
The Trust and Cumberland Farms argue that the Agreement is less than whole due to the absence of essential terms and is in fact an agreement to agree. Surely, our jurisprudence does not countenance an agreement to agree. See, E.g., Rosenfield, 290 Mass. at 217. Such a document is of no legal significance. Id. The allegedly missing terms, environmental safeguards and strictures regarding the equipment affixed to the premises, are not essential to a binding contract. The opposition’s reliance on Waterfall Farm Sys., Inc. v. Craig, 914 F.Sup. 1213 (D.MD. 1995), is misplaced, as the opponents read too much into the cited decision. The case is distinguishable because the parties in Waterfall Farms left various essential terms, including environmental liability, open for further negotiation at the time of the execution of the letter of agreement. Id. at 1222. The facts clearly indicated that the parties did not intend to be bound until a formal agreement was prepared and signed, and indeed, the letter of agreement itself contained language indicating that further action by the parties would be necessary before an enforceable lease existed. Id. In the case at hand, when the Agreement was signed, all understood that Chevron was responsible for the past environmental degradation to the premises and that as a matter of law, Cape Oil would be responsible for any future harm done on its watch. See G.L.c. 2 IE, §5. With respect to the equipment and fixtures on site, Hayes and Romano were well aware of Cumberland Farms’ obligation to maintain the fixtures pursuant to Paragraph (21) of the Gulf Oil lease. In short, there were no loose ends of any material nature, a fact made all the more obvious by the Trust’s acceptance of the $1,000 binder tendered by Cape Oil.
*486 As a lease for a term of years, the Agreement had to meet the Statute of Frauds. G.L.c. 259, §1. In order to satisfy the Statute of Frauds, the written agreement must contain directly, or by implication, all of the essential terms of the parties’ agreement. See Michelson, 310 Mass. at 775; Simon v. Simon, 35 Mass.App.Ct. 705, 709 (1994). Whether a writing satisfies the Statute of Frauds is a question of law. Schwanbeck v. Federal-Mogul Corp., 412 Mass. 703, 709-10 (1992). The Court’s function, therefore, is “to determine what provisions are essential to an agreement sought to be enforced and whether an omitted provision can be supplied by implication.” Simon, 35 Mass.App.Ct. at 709. The Agreement passes muster under the Statute of Frauds.
The Trust and Cumberland Farms object to the Agreement as an improper lease injiituro. They argue that the Agreement does not contain words reflecting a present demise, that the Agreement could not have constituted a present demise because the property was then being leased to Cumberland Farms, and that the Agreement did not state a precise starting date. Their objections, and the very concept of a lease injiituro, are grounded in the evolutionary history of our jurisprudence. Present-day lease law derives its vitality from contract law, not moribund concepts of real property law.
The Agreement indicated the parties’ clear intent to be immediately bound, contained the essential elements of an enforceable lease, and satisfied the Statute of Frauds. Contrary to the opponent’s assertion regarding the validity of a lease injuturo, the Agreement did contain language of a present demise. The Agreement stated that “Cape Oil ... offers [] to lease [the Gas Station] from the Lacy Hayes Trust” and that “the Lacy M. Hayes Revocable Trust accepts this offer...” The Agreement stated that the lease is to commence within seven days following the earlier of Cumberland Farms’ vacating of the premises or the expiration of its then-current lease. Based on the language of the Agreement and the circumstances surrounding the drafting of the Agreement, the parties manifested an intent for a present demise to commence in the future, and this Court has no doubt that the instrument is a lease rather than an agreement to form a lease at some future time. See Weed v. Crocker, 79 Mass. 219, 224-25 (1859); Bacon v. Bowdoin, 39 Mass. 401, 405 (1839) (“Under these circumstances there can be no doubt, we think, that the parties intended, what the language of the instrument clearly imports, namely, a present demise to commence injuturo”); see also Shaw v. Farnsworth, 108 Mass. 357, 360 (1871) (“No additional document was necessary to express the intent of the parties”).
The Trust and Cumberland Farms fail to cite any authority for the proposition that the Agreement could not constitute a present demise because the property was then under lease to Cumberland Farms. A lease in futuro can contain a present demise to commence in the future. Bacon, 39 Mass. at 405. The fact that the property was then under lease to Cumberland Farms did not prevent the Hayes Trust from entering into a binding lease with Cape Oil commencing after the expiration of Cumberland Farms’ lease.
The opponents fail to cite any authority supporting their argument that a precise starting date, i.e., a specific calendar date, is a prerequisite to constitute a valid lease in futuro. Logic dictates that the requirement for a valid lease in futuro with respect to its commencement date is no different from that of the typical lease. As already stated above the Agreement “prescribefd] with reasonable certainty the date of commencement,” as it is specifically stated that the lease commenced within seven days following Cumberland Farms’ vacating of the premises or the expiration of its then-existing lease. Wunsch, 302 Mass. at 288. The Agreement does not fail as a lease in futuro. To the contraiy, the Agreement is a binding contract.
Having entered into a valid contract with Cape Oil, the Trust was obligated to proceed in good faith and with fair dealings to bring the contract to fruition. Anthony's Pier Four, Inc. v. HBC Associates, 411 Mass. 451, 471-72 (1991). Instead, the Trust joined forces with Cumberland Farms to engineer the sale of the property under the bogus scheme that the sale was sanctioned by Paragraph (22) of the Gulf Oil lease. Bogus is not too strong a word given the total lack of a foundation in fact to apply Paragraph (22).
Paragraph (22) creates, in favor of Cumberland Farms, a “preferential right to buy the leased premises” but only “at all times during the term of the lease.” Cumberland Farms reached an agreement to buy the premises on April 9, 1999. Prior thereto, Hayes and Cumberland Farms were dickering over offers to lease, offers to lease with an option to purchase, and offers to sell. Cumberland Farms’ rights under the lease ceased at the end of the day on February 28, 1999. In short, Cumberland Farms had no preferential right in April 1999.
This jurist hastens to add that the “preferential right” in Paragraph (22) of the Gulf Oil lease cannot be stretched to the extent sought by the Trust and Cumberland Farms. The first sentence of Paragraph (22) establishes the tenant’s “preferential right” to buy the property. Learned counsel suggests that the first sentence creates a right to buy the premises separate and apart from the narrower right of first refusal set forth in the remaining sentences in Paragraph (22). Contract language cannot be so parsed. The law requires that the provisions of Paragraph (22) be read as a whole. See USM Corp. v. Arthur D. Little Sys., Inc., 28 Mass.App.Ct. 108, 116 (1989) (“The object of the court is to construe the contract as a whole, in a reasonable and practical way, consistent with its language, background, and purpose”). Such a reading leaves one with the firm conclusion that the “preferential right” set forth in the first sentence is further defined by the succeeding sentences. In fairness, the “preferential right” is no greater than the right of first refusal detailed in the remainder of Paragraph (22).
*487 Based on a whole, Paragraph (22) created a right of first refusal triggered upon the landlord presenting the tenant with “one or more bonafide offers to purchase” the premises. On several occasions, Hayes presented Cumberland Farms with the Cape Oil Agreement. While Cumberland Farms’ counsel deemed the Agreement “a bonafide offer from Cape Oil Delivery to purchase” the premises (EX. 12), this Court rules otherwise. A bonafide offer to purchase is a written and enforceable offer to purchase submitted to the owner by a third party. Roy v. George W. Greene, Inc., 404 Mass. 67, 69-70 (1989). Paragraph (5) of the Agreement merely gave Cape Oil the option to purchase the gas station after the second year of the lease; this provision by no means required Cape Oil to purchase the gas station after two years. An offer is not an option and vice versa. See Roy, 404 Mass. at 69-70. Paragraph (5) takes effect only after the second year of the lease of the premises to Cape Oil and only at the unilateral discretion of Cape Oil. If Cape Oil ultimately chose not to exercise the option to purchase, the Trust could not have sued to force a purchase. The Agreement did not constitute a bonafide offer to purchase sufficient to trigger the provisions of Paragraph (22) of the Gulf Oil lease.
Even if the Agreement was a bonafide offer to purchase, the facts at hand leave the Hayes/Cumberland Farms team without a goal. The Agreement was presented to Cumberland Farms during 1992. As of April 1993, Cumberland Farms had decided not to purchase the premises in the face of the Agreement. Any rights Cumberland Farms had pursuant to Paragraph (22) were thereafter extinguished by virtue of the terms of Paragraph (22). Said provision gave Cumberland farms but sixty days to decide to buy the premises, not seven years. If one were to share in Attorney Anastas’ fiction that Hayes presented the Agreement as an offer to purchase “on or about March 3, 1999" (Ex. 12), that presentation was made after Cumberland Farms lost the benefits of the Gulf Oil lease.
A further comment is in order regarding the charade mounted by Cumberland Farms under the guise of Paragraph (22). Cumberland Farms did not exercise a right of first refusal, for the right of first refusal entitled Cumberland Farms to buy the property “at the price offered.” Cape Oil’s option price was $275,000. Cumberland Farms paid $300,000. This jurist infers that at the time Cumberland Farms knew full well it was not exercising a right of first refusal, but instead was making a superior bid at a silent auction rigged by Robert Hayes.
In summary, the Cape Oil Agreement is a binding contract. The Trust breached the contract and the concomitant obligation to act fairly and in good faith to implement the contract by selling the properly to Cumberland Farms. Anthony’s Pier Four, Inc., 411 Mass. at 471-72. Cumberland Farms had no superior right pursuant to the Gulf Oil lease to purchase the premises. Cumberland Farms had full knowledge of the Agreement from 1992 onward and purchased the premises despite knowing Cape Oil’s avowed intention to enforce the Agreement.
Cumberland Farms was aware of the Cape Oil Agreement almost from its inception in 1992. At the outset, the Agreement served the interests of Cumberland Farms, for it presented the corporation with a graceful exit from what corporate executives then viewed as a marginal operation. As Cumberland Farms emerged from its bankruptcy reorganization, the Agreement was of no consequence, for Cumberland Farms was content to maintain the status quo under its superior position during the five-year extension of the Gulf Oil lease. Once the competitor gas station across the street shut down, Cumberland Farms suddenly found itself in possession of a cash cow. From late 1998 through April 26, 1999, Cumberland Farms realized the Cape Oil Agreement was an impediment to its continued profitable operations in East Dennis.
In the case of Melo-Tone Vending, Inc. v. Sherry, Inc., 39 Mass.App.Ct. 315, 318-20 (1996), Justice Kass, in his inimitable style, discussed the elements of intentional interference with a contract. The tort is complete when the plaintiff proves that “(1) he had a contract with a third party; (2) the defendant knowingly induced the third party to break that contract; (3) the defendant’s interference, in addition to being intentional, was improper in motive or means; and (4) the plaintiff was harmed by the defendant’s actions.” Melo-Tone Vending, Inc., 39 Mass.App.Ct. at 318, quoting G.S. Enterprises, Inc. v. Falmouth Marine, Inc., 410 Mass. 262, 277 (1991). Cape Oil obviously has satisfied the first element. The fourth element, while established in gross, must be reduced to a dollar amount in the second phase of the trial. The second and third elements bear some discussion, albeit brief.
Cumberland Farms induced Hayes to breach the Cape Oil Agreement by paying a greater purchase price for the property and by promising to indemnify and defend Hayes in the event Cape Oil sued. Surely Hayes was a willing participant in the tort and not a misled lamb, but the inducement was the extra $25,000 beyond Romano’s option price. That inducement came from Cumberland Farms. The real fulcrum on which Count V in the Superior Court action rests is whether Cumberland Farms’ conduct was improper in motive or means, the very turning point in Melo-Tone. Justice Kass said it best:
It is one thing to lure a customer away from someone with whom it has been doing business by means of a better product, service, or prices but quite another to abet the repudiation of solemn contractual obligations of which the party interfering is well aware.
Melo-Tone Vending, Inc., 39 Mass.App.Ct. at 319. Cumberland Farms knew full well, through the intentional missteps of its employees, that it was inducing Hayes to breach a solemn contractual obligation. General Counsel for Cumberland Farms admitted in 1999 the validity of the Cape Oil Agreement as a binding purchase and sale agreement (EX. 21), a concession which implicitly *488 admitted the Agreement was a binding lease. Cumberland Farms’ conduct was improper in motive.
The Trust fares no better. Indeed, Hayes’ conduct in orchestrating the events slams the door shut on any mitigating notions. Together the Trust and Cumberland Farms engaged in unfair and deceptive business practices in violation of G.L.c. 93A, §§2, 11. A breach of the covenant of good faith and fair dealing may constitute an unfair or deceptive act or practice for purposes of G.L.c. 93A, §11. Massachusetts Employers Ins. Exchange v. Propac-Mass. Inc., 420 Mass. 39, 43 (1995). Furthermore, “[cjonduct in disregard of known contractual arrangements and intended to secure benefits for the breaching party constitutes an unfair act or practice.” Anthony’s Pier Four, Inc., 411 Mass. at 474; Wang Laboratories, Inc. v. Business Incentives, Inc., 398 Mass. 854, 857-59 (1986). Also, intentional interference with contractual relations can serve as the basis for unfair and deceptive practices under G.L.c. 93A, §11. Melo-Tone Vending, Inc., 39 Mass.App.Ct. at 320. The knowing and willful actions of Hayes, on behalf of the Trust, in failing to act in good faith to bring the Agreement to fruition, thus denying Cape Oil “the fruits of the [Agreement],” in order to secure additional benefits for the Trust, i.e., more money, constitutes a clear violation of c. 93A, §11. Anthony’s Pier Four, Inc., 411 Mass. at 471-72; Wang Laboratories, Inc., 398 Mass. at 857. Cumberland Farms’ conduct in intentionally inducing Hayes to breach a solemn contractual obligation, as described above, also constitutes an unfair or deceptive act in violation of G.L.c. 93A, §11. Melo-Tone Vending, Inc., 39 Mass.App.Ct. at 320.
Our miscreants find no refuge in the suggestion in the early case law that the Consumer Protection Act is blind to the rough and tumble conduct in a laissez faire marketplace. Melo-Tone Vending, Inc., 39 Mass.App.Ct. at 319. Together the Trust and Cumberland Farms:
(a) assumed, without an adequate basis in fact, a start and end date for the Gulf Oil Lease, which served their purposes and precluded any opportunity for fair play with Cape Oil;
(b) hid behind the right of first refusal in the Gulf Oil lease when they had no right or even a colorable argument to do so;
(c) refused to divulge information to Cape Oil during March and early April 1999 which would have permitted Cape Oil to access the courts to protect its interests; and
(d) ultimately barred Cape Oil from recovering the fruits of its contract by orchestrating the breach of the contract.
In short, the two are liable for Chapter 93A damages, including attorneys fees.
The remaining counts of the Superior Court action can be quickly disposed of.
While the conduct of Hayes supports Cape Oil’s claim of misrepresentation against the Trust, the tort of misrepresentation requires reliance-type damages. Danca v. Taunton Savings Bank, 385 Mass. 1, 8-9 (1982). As a matter of fact, this jurist has found no material reliance by Cape Oil. The sale of the South Yarmouth gas station was never proven to be linked to the transaction at hand. The plans Romano made to improve the East Dennis site remained as plans without the commitment on Cape Oil’s part of hard dollars. Promissory estoppel as sought in Count IV of Cape Oil’s complaint, fails in two respects. In this instance a binding contract has been found but no material reliance occurred. Both findings preclude promissory estoppel. See Guckenberger v. Boston University, 974 F.Sup. 106, 150 (D.Mass. 1997). Finally, despite Cape Oil’s invitation to do otherwise, this jurist is content to let the conspiracy count rest in the dismissal pile where it was placed on summary judgment.
ORDER
For the above-cited reasons, it is ORDERED that in Land Court, Action No. 256502, partial declaration enter DECLARING that:
a), the Cape Oil Agreement is an enforceable contract;
b). the Gulf Oil lease terminated January 30, 1999, and that Cumberland Farms, Inc. ceased to enjoy the benefits of said lease as a holdover tenant effective March 1, 1999; and
c). Cumberland Farms, Inc. had no preferential right pursuant to the Gulf Oil lease to purchase the premises on April 26, 1999.
Further declaratory relief to determine Cape Oil Delivery, Inc.’s right, title and interest in the premises, if any, must await the second phase of the trial of this action.
For the above-cited reasons, it is ORDERED that in Barnstable Superior Court Action No. 99-3915 PARTIAL JUDGMENT enter that:
a), on Count I, the defendant Hayes Trust is liable for its breach of the Cape Oil Agreement;
b). on CountV, the defendant Cumberland Farms, Inc. is liable for intentional interference with Cape Oil’s contractual/business relations with Hayes Trust;
c). on Count VI, the defendants Hayes Trust and Cumberland Farms, Inc. are liable for unfair and deceptive business practices against Cape Oil; and
d). Counts III, IV, and VII be DISMISSED/
Further relief in the form of damages on Counts I, V, and VI and relief, if any, in the form of specific performance on Count II must await the second phase of the trial of this action.
The Clerk is directed to confer with counsel to set a convenient date for the second phase of the trial of these actions.