SITUATION MANAGEMENT SYSTEMS, INC. *vs.* MALOUF, INC.

Plymouth. December 6, 1999. - March 8, 2000.

Present: MARSHALL, C.J., ABRAMS, LYNCH, GREANEY, IRELAND, SPINA, & COWIN, JJ.

*Contract,* What constitutes, Damages. *Damages,* Breach of contract.

Evidence at the trial of a counterclaim for breach of contract was sufficient for the jury reasonably to conclude that the parties created an enforceable contract on the same or substantially similar terms as their three prior agreements over the course of fifteen years, even if certain terms were yet to be negotiated. [878-880]

At the trial of an action for breach of contract, there was no error in the jury's award of damages for lost profits. [880-881]

CIVIL ACTION commenced in the Superior Court Department on March 19, 1993.

The case was tried before *John J. O'Brien,* J.

The Supreme Judicial Court granted an application for direct appellate review.

*Richard E. Gentilli (Thomas M. Looney* with him) for the plaintiff.

*John P. Griffith* for the defendant.

IRELAND, J. Situation Management Systems, Inc. (SMS), filed suit against Malouf, Inc., doing business as LMA, Inc. (LMA), following the dissolution of a seventeen-year business relationship. In response, LMA filed several counterclaims, including a breach of contract claim based on an oral agreement between the parties. The case was tried before a jury, which returned a verdict in favor of LMA and awarded damages of $3.8 million. SMS's motion for judgment notwithstanding the verdict, or, alternatively, a new trial or remittitur, was denied and SMS appealed. We granted SMS's application for direct appellate review. We conclude that there was sufficient evidence from which a jury reasonably could have found the existence of an enforceable agreement between these parties, and accordingly affirm the judgment.

In considering a motion for a judgment notwithstanding the verdict, we view the evidence in the light most favorable to the nonmoving party. See *Labonte* v. *Hutchins & Wheeler*, 424 Mass. 813, 821-822 (1997), citing *Cimino* v. *Milford Keg, Inc.*, 385 Mass. 323, 326 (1982). During the relevant time period, SMS was in the business of developing and selling training materials and conducting seminars and workshops on topics such as communication and negotiation skills. LMA was in a similar business, primarily using materials it purchased from SMS. LeRoy Malouf, the founder of LMA, began his career as an employee of SMS before founding LMA, and LMA was an independent agent of SMS from 1976 to 1992.

The parties had three agency contracts over the years. The terms of each were substantially the same, except that the duration of the contracts varied between two and three years. The last written contract between the parties was executed in May 1989, and had a two-year initial term beginning January 1, 1989. The contract also had a single two-year option to renew. Before the execution of the 1989 agency agreement, the parties' previous agreement had expired on July 1, 1988. During that time, LMA and SMS continued to do business together. All of the agency contracts provided that the contract would not be renewable unless LMA met a certain sales goal. LMA always met its assigned goals.

In 1989, one of the independent agents selling SMS products, The Kasten Company (Kasten), was for sale. SMS considered buying Kasten in order to retain the clients who bought SMS products, but it did not or could not meet the asking price. Malouf learned of the opportunity to purchase Kasten and had a discussion with Earl Rose, the president of SMS, about the possibility of LMA making the purchase. In early 1990, they had a second discussion about the prospective purchase. Rose encouraged the purchase during these conversations and stated that if anyone was going to buy Kasten, he preferred it to be LMA. because of its long-established course of dealing with SMS. Malouf repeatedly told Rose, during their conversations and meetings, that he would need at least a five-year agreement with SMS before LMA could afford to commit to the purchase of Kasten.

On February 20, 1990, there were two meetings between LMA and SMS. In the morning, there was a meeting at LMA's offices where its marketing team discussed LMA's future projec-

tions regarding business with SMS. There was also a later meeting at Logan Airport to talk about LMA's possible purchase of Kasten. Present at that meeting were Malouf, William LeClere, executive vice-president of LMA, and Alex Moore, chairman of SMS. At the airport meeting, Malouf told Moore that LMA would not purchase Kasten without a commitment from SMS that it would enter into a long-term agreement. Moore assured Malouf of that commitment, agreeing to change the existing contract to a five-year term. Based on this statement, Malouf negotiated an agreement to purchase Kasten.

By June, 1990, LMA had not received a written contract from SMS. Malouf telephoned Rose and told him that the closing date with Kasten was approaching and that he needed confirmation that a five-year agreement was forthcoming. During that conversation, Rose expressed to Malouf his assurance of both a long-term agreement of at least five years and his "enthusiastic support" of LMA's purchase of Kasten. Immediately after the conversation with Rose, Malouf telephoned the owner of Kasten to confirm that a five-year agreement with SMS was in place and that LMA would proceed with the purchase.

In August, 1990, SMS sent a proposed renewal contract to LMA. The proposed contract contained significant changes from past contracts, including a term stating that LMA had to increase its sales of SMS products by twelve per cent every year or face termination. Negotiations regarding the new terms stretched out over many months, and in February, 1991, SMS terminated the negotiations and advised LMA that it would allow the existing contract to expire in December, 1992. Following the expiration of that contract, LMA's sales declined from $2,700,000 in 1992 to $500,000 in 1993.

Subsequent to the expiration of the contract, SMS sued LMA for payment of seminar materials and LMA filed a counterclaim for breach of contract. The parties eventually stipulated to the amount LMA owed SMS on the original claim for payment of seminar materials, and the only issue remaining at trial was LMA's breach of contract counterclaim. At trial, an economist testifying for LMA estimated lost profits over the three-year period, 1993-1995, totaling $3,834,000. The judge instructed the jury, without objection, that in order to prove a contract, LMA had to show that it "was more probable than not" that there was an offer, an acceptance of that offer, and an agree-

ment between LMA and SMS as to the essential elements of the contract. The jury were instructed that, while it was not necessary for LMA to show that every detail of the contract was agreed to, LMA must have shown that all the essential or material terms were agreed to before the agreement could become enforceable. The judge further instructed the jury that promises made with an "understood intention" that they were not to be binding did not create a contract; that evidence that the parties intended to execute a formal agreement is evidence that the parties did not intend to be bound until the execution of that agreement; and that agreements to agree or agreements which do not adequately specify essential terms are unenforceable. The jury returned a special verdict finding that SMS promised a five-year commitment to LMA and that LMA suffered $3.8 million in damages as a result of SMS's breach of contract.

1. *Existence of an enforceable agreement.* SMS argues that the evidence at trial did not warrant a finding that the parties had entered into an enforceable contract because there was no "meeting of the minds" — that is, that significant, material terms were still to be negotiated.

It is axiomatic that to create an enforceable contract, there must be agreement between the parties on the material terms of that contract, and the parties must have a present intention to be bound by that agreement. See *McCarthy* v. *Tobin*, 429 Mass. 84, 87 (1999); *Rosenfield* v. *United States Trust Co.*, 290 Mass. 210, 216 (1935) (failure to agree on material terms may be evidence that parties do not intend to be presently bound); *David J. Tierney, Jr., Inc.* v. *T. Wellington Carpets, Inc.*, 8 Mass. App. Ct. 237, 241 (1979), and cases cited (party to contract may be found to have entered binding agreement if party intended to be presently bound). It is not required that all terms of the agreement be precisely specified, and the presence of undefined or unspecified terms will not necessarily preclude the formation of a binding contract. See *Lafayette Place Assocs.* v. *Boston Redevelopment Auth.*, 427 Mass. 509, 517-518 & n.9 (1998), cert. denied, 525 U.S. 1177 (1999). The parties must, however, have progressed beyond the stage of "imperfect negotiation." *Id.* See *Rosenfield* v. *United States Trust Co., supra* at 217.

We conclude that there was evidence introduced at trial from which a jury could reasonably determine that when either Moore or Rose assured Malouf of SMS's commitment to LMA for five

years, in return for LMA's commitment to purchase Kasten, the parties created an enforceable contract on the same or substantially similar terms as their three prior agreements, even if certain terms of the agreement were yet to be negotiated. See *Miles* v. *Edward O. Tabor, M.D., Inc.*, 387 Mass. 783, 786 (1982), quoting *Abraham* v. *Woburn*, 383 Mass. 724, 727-728 (1981) (standard of review for motion for judgment notwithstanding verdict is whether "anywhere in the evidence, any combination of circumstances could be found from which a reasonable inference could be drawn in favor" of nonmoving party). The evidence showed that, by 1990, LMA and SMS had continuously been doing business together for fifteen years; that the terms of the parties' prior agency agreements had been substantially the same over the entire course of their business dealings; that the principals of the respective companies, Rose and Malouf, had a personal relationship in addition to their trusting business relationship; that previous agency contract negotiations between the parties had been mostly perfunctory; that the parties at one time had continued to do business together for almost one year without an executed contract; and that SMS was well aware that LMA was purchasing Kasten in reliance on the five-year commitment and with an expectation that the terms of the agency agreement would remain substantially the same. Although SMS introduced evidence to the contrary, particularly evidence that, after SMS gave the oral assurances, there were material terms yet to be negotiated, resolution of such fact questions are generally reserved for the jury, and were properly left to the jury's determination in this case. See *Gleason* v. *Mann*, 312 Mass. 420, 423 (1942), and cases cited (where existence and terms of agreement rested on oral evidence, it is for jury to determine existence of agreement and its provisions); *David J. Tierney, Jr., Inc.* v. *T. Wellington Carpets, Inc.*, supra at 239, quoting *Bresky* v. *Rosenberg*, 256 Mass. 66, 75 (1926) ("Ordinarily the question whether a contract has been made is one of fact. If the evidence consists only of writings, or is uncontradicted, the question is for the court, otherwise it is for the jury").

SMS further argues that the oral agreement was not binding because the parties intended to execute a written contract.[1] While it is true that the parties' intention to execute a final writ-

---

[1] Although SMS made a passing reference to the Statute of Frauds in its papers filed with this court, it is not an issue in this case because SMS did not

ten agreement "justifies a strong inference that the parties do not intend to be bound" until the agreement is executed, it is also true that if "all the material terms . . . have been agreed upon, it may be inferred that the writing to be drafted and delivered is a mere memorial of the contract." *Rosenfield* v. *United States Trust Co.*, *supra* at 216. See *Kilham* v. *O'Connell*, 315 Mass. 721, 724-725 (1944) (where jury could find sufficient evidence that oral contract existed, parties' intention to memorialize contract in writing did not defeat existence of contract). Here, there was sufficient evidence to support either inference. The jury were therefore warranted in reaching their verdict.[2]

2. *Measure of damages.* SMS also argues that the damage award was improper because (1) it should have been limited to the amount LMA paid for Kasten; and (2) the amount of the award was erroneously based on LMA's gross revenue instead of net revenue.

The usual rule for damages in a breach of contract case is that the injured party should be put in the position they would have been in had the contract been performed. See, e.g., *Abrams* v. *Reynolds Metals Co.*, 340 Mass. 704, 708 (1960); *F.A. Bartlett Tree Expert Co.* v. *Hartney*, 308 Mass. 407, 708 (1941); Restatement (Second) of Contracts § 344 (1979). An award of "expectancy" damages may include lost profits. As such, the jury were warranted in awarding lost profits to LMA. Further, we find nothing in the record to suggest that the damage award

plead the defense in its answer to LMA's counterclaim nor otherwise appropriately raise it. See *Whiting* v. *Commonwealth*, 370 Mass. 664, 673 (1976) (Statute of Frauds deemed waived if not affirmatively pleaded); *Pieczarka* v. *Pieczarka*, 328 Mass. 51, 51-52 (1951); Mass. R. Civ. P. 8 (c), 365 Mass. 749 (1974). See also G. L. c. 259, § 1 (Statute of Frauds requires any agreement not to be performed within one year to be in writing).

[2]SMS also argues, citing *Rhode Island Hosp. Trust Nat'l Bank* v. *Varadian*, 419 Mass. 841 (1995), that LMA cannot recover under a reliance theory because, to the extent it relied on SMS's verbal commitments to a five-year relationship, such reliance was unreasonable. In that case, we determined that a bank's oral promise to provide a multi-million dollar construction loan did not create an enforceable agreement. See *id.* at 850. We concluded that any reliance on the bank's oral commitment to provide the loan was unreasonable as a matter of law, because the jury had specifically found that both the bank and the intended loan recipient intended only to be bound by a written agreement. See *id.* at 842-843, 850. In this case, we decide the existence of a contract under traditional contract law.

was based on gross revenue rather than net revenue. SMS did not challenge the expert testimony.

Based on the above considerations, we conclude that there was sufficient evidence presented at trial from which a reasonable inference could be drawn that an enforceable contract between SMS and LMA had been formed, and that the damages awarded were proper.

*Judgment affirmed.*