WAYNE KURKER *vs.* SHOESTRING PROPERTIES LIMITED
PARTNERSHIP & others.[1]

No. 06-P-161.

Barnstable. November 14, 2006. - April 12, 2007.

Present: PERRETTA, COWIN, & MILLS, JJ.

*Contract,* Specific performance, Sale of real estate, Misrepresentation. *Real
Property,* Purchase and sale agreement, Specific performance.

In a civil action seeking specific performance of either a final offer to purchase
or a subsequent purchase and sale agreement concerning land, the judge
erred in ruling that the offer to purchase was void on the ground that the
parties intended that the offer to purchase be subject to a condition (i.e.,
the execution of the purchase and sale agreement), where that conclusion
was inconsistent with the judge's explicit finding that the parties agreed on
all material terms and intended to be bound by the offer to purchase;
moreover, even if the execution of a purchase and sale agreement were a
condition to the enforceability of the offer to purchase, the plaintiff would
still be entitled to specific performance of the offer to purchase, where the
pursuit of the only unfinished business under the purchase and sale agree-
ment — the agreement of a third party to the terms of a certain clause —
would have been a futile gesture under the circumstances. [653-657]
The judge in a civil action properly concluded that no actionable claim for
misrepresentation under G. L. c. 93A existed. [657]

CIVIL ACTION commenced in the Superior Court Department on
June 17, 2002.

The case was heard by *Robert J. Kane,* J.

*J. Gavin Cockfield* for the plaintiff.

*Jennifer S.D. Roberts,* for the defendants, submitted a brief.

MILLS, J. The plaintiff, Wayne Kurker, sought specific
performance of either a final offer to purchase (final OTP) or a
subsequent purchase and sale agreement concerning land in Hy-
annis used as a marina. After a seven-day trial, jury waived, a
Superior Court judge found that the final OTP contained all

---

[1]Stuart A. Bornstein and Shoestring Properties Corporation.

material terms of an agreement for the sale, and that the final OTP reflected the intention of the parties to be bound by their agreement. However, the judge went on to state that the final OTP was subject to the execution of a purchase and sale agreement, which, though executed by the parties, was held in escrow, thereby defeating the buyer's right to specific performance and other remedies. Judgment entered accordingly, and the parties filed cross appeals. We conclude that the final OTP is enforceable and that the plaintiff is entitled to specific performance of that agreement.

1. *Background.* We recite this narrative of the negotiations and transactional details. The facts are essentially based upon the judge's warranted findings. The defendant Stuart A. Bornstein is the principal officer and sole shareholder of the defendant Shoestring Properties Corporation (corporation), which in turn is the corporate general partner of the defendant Shoestring Properties Limited Partnership (partnership). In 1995, Bornstein, through the partnership, acquired property in Hyannis, consisting of Parcel A, containing the Dockside Restaurant (restaurant); Parcel B, containing a marina (marina); and an undeveloped parcel to the west of the restaurant (west parcel). The restaurant stands on a peak above Hyannis's inner harbor, and "[b]ecause of its immediacy to the harbor and its angle to the outer bay, the [restaurant] bestows uncommon vistas of seascape." The marina consists of boat slips, with an adjoining asphalt parking area that recedes to a hill and then ascends a coastal bank[2] directly below the plateau occupied by the restaurant.

In 2001, Bornstein desired to sell all three parcels and knew that one Kelleher had an interest in the restaurant, and that the plaintiff, Kurker (who owned another marina across the bay), had an interest in purchasing Bornstein's marina. Bornstein contacted Kelleher, who agreed to purchase the west parcel and Parcel A for $2.5 million, and Kelleher promptly engaged counsel to draft the transaction documents. At about the same time, Bornstein discussed with Kurker a proposal for the sale to him of the marina, including its piers, slips, and the parking area *portion* of Parcel B, for a sum of $2 million. At this time

[2]Coastal banks are defined in 310 Code Mass. Regs. § 10.30 (1997). See *Wilson* v. *Commonwealth*, 413 Mass. 352, 357 n.5 (1992).

Bornstein was not offering to sell the entirety of Parcel B, and was not negotiating to sell the hill. Kurker expressed interest in purchasing the hill. Though initially Bornstein was not willing to include the hill in the sale, he agreed to sell a portion of it after further negotiations.

On January 11, 2002, Kurker and Bornstein met with Robert Gatewood, administrator of the Barnstable conservation commission (conservation commission) and discussed a proposed expansion of the marina's operations on Parcel B, including construction of a building partially on the asphalt and partially on the hill. Kurker described a 320 square foot building containing a laundry, offices, and restrooms, partially on the parking lot and partially on the coastal bank. After this meeting, Bornstein and Kurker visited Parcel B, at which time Kurker offered to pay full price for the property if it included the whole hillside where he could erect a larger building for rental space, an oil recovery room, toilets, showers, patios, and an area for outside recreation. Bornstein refused to sell more of the hill than had been previously offered, namely, the part that would enable Kurker to build only the previously described 320 square foot building.

Also on January 11, 2002, Kurker submitted a written $2 million offer for Parcel B up to within seven and one-half feet of the restaurant property. Under the heading "Offer to Purchase Real Estate" appears the following: "This is a legal binding contact [*sic*]. If not understood, seek competent advice." The following paragraph appears at the bottom of the first page:

> "(a) If Seller does not fulfill Seller's obligations under this Agreement, said Agreement shall be enforceable both at law and in equity (inclusive of specific performance). (b) If Buyer does not fulfill its obligations under this offer, the deposit, (1)(a) mentioned above, shall become Seller's property as liquidated damages without recourse to either party."

Bornstein never accepted the $2 million offer and negotiations stalled. Then, toward the end of February, 2002, Bornstein called Kurker and explained that he had been receiving offers for Parcel B, and that he was "looking out for Kurker like a

brother." Kurker again emphasized to Bornstein his need to generate revenue through a building on the coastal bank. Responding, Bornstein warned that building on the bank would involve the construction of expensive retaining walls. After the February phone call, at a meeting between Bornstein and Kurker at Bornstein's office, Bornstein's son, Aaron, appeared and overheard Kurker mention his need for a "bigger" building.

On March 5, 2002, Kurker sent a facsimile to Bornstein that consisted of a cover sheet and sketch. The cover sheet stated:

> "You said you are looking out for me like a brother and I appreciate that. If I were to let you squeeze me out of the land I need to build a building in I would lose any potential to break even or make a profit (unless you were to reduce the price accordingly)."

The sketch showed a seven and one-half foot setback from the restaurant property and a blackened area, below the setback and above the parking lot, covering land which generally represents the area on which Kurker proposed to construct a 2,225 square foot building.

Meanwhile, Bornstein and Kelleher were negotiating the agreement for Kelleher's purchase of Parcel A and the undeveloped west parcel. Kelleher had by now learned of Kurker's interest in purchasing Parcel B and wanted to work out terms between Kurker and himself for their "coexistence." Although he had no objection to Kurker's construction of a building on Parcel B, Kelleher wanted land to the east for his plan to expand the restaurant. Kelleher proposed that he would take some land to the east, and Kurker would take more frontage on School Street where he could construct the building. In Kelleher's correspondence with Bornstein over Kurker's purchase of Parcel B, Kelleher sent along a sketch that depicted a building near School Street outside of the parcel's grassy area. Bornstein sent that sketch on to Kurker.

On March 23, 2002, Bornstein (through the partnership) and Kelleher and his wife executed a purchase and sale agreement for Parcel A and the west parcel. The agreement called for a closing date of May 15, 2002, and included Kelleher's right to terminate the agreement by notification to Bornstein on or before April 30,

2002, of his failure to obtain financing. The agreement also addressed the need for easements benefiting and burdening Parcel A. According to the agreement, Bornstein would provide a plan by April 1, 2002, depicting various items, including easements for water lines, sewer lines, sign posts and the view.[3] Meanwhile, Bornstein and Kurker engaged in a "give and take . . . , skirmished, negotiated, renegotiated, delayed and eventually settled their differences contemporaneously with the March 23[] execution of the Kelleher [purchase and sales agreement]."[4] On March 23, 2002, the partnership, through Bornstein and the corporation, executed the final OTP, which again contained legal warnings on its enforceability. In paragraph 5 thereof (and in the earlier March, 2002, drafts), the enforceability of the document explicitly included a remedy of specific performance, and related to the "offer" rather than the "agreement" (as had appeared in the January 11 draft offer). Attached to the final OTP was an exhibit that set forth the buyer's and the seller's rights and responsibilities in twenty-two clauses. Also attached to the final OTP was a sketch depicting the boundary line between Parcels A

---

[3]The language in Article XXV of the purchase and sale agreement between Bornstein and Kelleher provides as follows:

"Within ten (10) days after the execution of this Agreement, the Seller shall deliver to Buyer a proposed view easement (the 'View Easement'). The View Easement shall allow Buyer an unobstructed view of the ocean from the existing restaurant deck, running in perpetuity for the benefit of the Property, and burdening the parcel adjacent to the Restaurant Parcel (the 'Marina Parcel') which is presently owned by the Seller. The View Easement shall be in form and substance satisfactory to the Buyer's and Lender's counsel. If the View Easement is not satisfactory to Buyer's and/or Lender's counsel, then the Buyer may terminate this Agreement and this Agreement shall be null and void and of no further force or effect and neither party hereto shall have any further rights, duties, obligations, or liabilities, at law or in equity, arising out of or relating to this Agreement."

[4]On March 20, 2002, after receiving a draft OTP from Bornstein, Kurker returned an OTP containing, in paragraph (5) of an addendum, the following:

"(5) Seller to allow Buyer to use the bathrooms in the restaurant for up to 2 years or until the Buyer can legally build and install its own facilities, whichever occurs first. Seller will allow Buyer to apply (at Buyer's expense) for a ladies and men's room and *facility* building in the coastal bank under Seller's name and seller will assist Buyer with promotion of project."

and B. The language of the final OTP addressing the view easement for the restaurant is reproduced in the margin.[5]

After executing the final OTP, Bornstein ordered a plan for division of the parcels, which the town planning board endorsed on April 23, 2002. At about the same time Bornstein, through his attorney, ordered easement plans for water and sewer lines related to the restaurant parcel. Kurker began making preparation for the marina expansion and immediately engaged Robert Braman and his engineering firm to assist in preparing plans for dredging, the addition of floats, and the construction of a marina building. Kurker informed Braman that he wanted a maximum building footprint, and to assist Braman in completing that plan, Kurker provided architectural schematics showing a building much larger than the 320 square foot building that Kurker had earlier described to Gatewood. Kurker submitted Braman's plans to the conservation commission as well as to the local waterways committee and the Barnstable shellfish warden. The plans showed a two-story building with an approximate square footage of 2,300 feet.

On or about April 25, 2002, Kurker sent to Bornstein and other abutters, via certified mail and in accordance with applicable notice requirements, a notice summarizing his proposed project and the size of the building. At this time, Bornstein made no inquiry of Kurker about his building plans. Kurker had retained attorney Patrick Butler to draft a purchase and sale agreement, and on April 5, 2002, Butler sent Bornstein's lawyer, Edwin Taipale, a first draft of a purchase and sale agreement that differed from the final OTP in a number of ways, including (1) changes in the dates for closing, due diligence deadlines, and the financing contingency; (2) provisions surviving delivery of the deed; (3) payment of attorney's fees in the event of the seller's default; (4) allocation of dockage fees; and (5) a use restriction benefiting the restaurant.[6]

Days later, Taipale responded to Butler, asking that the

---

[5]"(16) Buyer agrees to grant a view easement to the Dockside Restaurant as follows: No structures shall be built any higher than the existing Dockside Restaurant deck height."

[6]The use restriction was designed to prevent the owner of Parcel B from

purchase and sale agreement include a clause providing for a tax-free exchange under the provisions of the Internal Revenue Code. On April 16, 2002, Taipale asked Kurker about changing the view easement, and Kurker questioned why he should agree to alter the view easement language from that contained in the final OTP. Taipale then suggested that, in exchange, Bornstein would make changes to due diligence deadlines and the proration of dockage fees. Because these changes were favorable to Kurker, Butler and Taipale worked on language further describing the view easement.[7] Taipale, with Kurker and Bornstein's engineer, Arne Ojala, visited the site for the purpose of describing the view easement. At this meeting, Kurker agreed that his building would be restricted, in the asphalt area, to twenty-four feet in height and forty percent ground coverage. In effect, this meant that in the paved area there would be a building limitation of up to 6,000 square feet.

On April 29, 2002, Kurker signed a purchase and sale agreement that was presented by Butler. The agreement incorporated some changes from the final OTP as follows: (1) the closing date; (2) a notation that the division plan had been approved; (3) an extension of permitting and due diligence dates; (4) a change in allocation of dockage fees; (5) a modification of the use restriction; (6) the insertion of the tax-free exchange clause; (7) the addition of enforcement costs as against the seller; (8) a change in the description of the view easement to include no building "above elevation 30.9' above mean sea level" and, in the area south "of the edge of pavement," a building no higher than "24.00' above mean sea level" and occupying no more than "forty percent . . . of the existing pavement area"; and (9) the inclusion of a sign easement.

That same day, the purchase and sale agreement, signed by Kurker, was delivered to Bornstein's office. Later that day,

operating a "retail food establishment" in competition with the restaurant.

[7] While it may be apparent that Bornstein, through Taipale, was attempting to address the discrepancy between the view protection that Bornstein had agreed to in his purchase and sale agreement with Kelleher (see note 3, *supra*) and the restriction that appears in the final OTP (as it had also appeared in several earlier iterations of the OTP), the judge made no finding as to what explicit agreement, if any, Kurker had made as to "language further describing the view easement."

Bornstein told Butler that he had signed it but had not yet consulted with his lawyer, Taipale, who was out of the office. Butler promised to hold the purchase and sale agreement in escrow until it had been reviewed by Taipale, and indicated that "it wouldn't be a binding agreement until we released it . . . ."

Later on the same day, Butler heard from Taipale, who said that he had some problems with the purchase and sale agreement because it did not contain a view easement self-help clause as had been proposed by Kelleher through Taipale. Taipale told Butler to call Kelleher's attorney, Malcolm Finks, about the self-help clause language, and on that afternoon they discussed a compromise in the matter. Butler then drafted language for a self-help remedy and included it in a memorandum that he faxed to Bornstein, Taipale, and Finks.[8] By April 30, Bornstein, through Taipale, had identified three potential problems with the escrowed purchase and sale agreement. One problem concerned the proration of dockage fees, a second related to hazardous waste liability, and the third involved the view easement language. The first two problems were resolved, leaving the view easement language as the only remaining unresolved issue. Bornstein, through Taipale, indicated that the view easement language should be resolved by Kurker and Kelleher. On behalf of Kurker, Butler proposed a clause that was acceptable to Kurker and that Finks said he would recommend to Kelleher. On the same day, however, Finks's recommendations became irrelevant when Kelleher withdrew from his transaction with Bornstein based upon the financing contingency contained in his purchase and sale agreement. Kelleher, accordingly, never assented to the view easement language that had been proposed by Butler and agreeably received by Finks.[9]

On April 30, 2002, Bornstein visited the conservation com-

---

[8]The self-help remedy would provide the seller and his assigns with the right to enter on to Parcel B to remove any structure that violated the terms of the view easement.

[9]The judge made no explicit finding that Kelleher's assent to the language was a requirement for the release of the purchase and sale agreement from escrow. It does seem, however, that the judge considered resolution of the view easement language to Kelleher's satisfaction as the final step to the release of the purchase and sale agreement from escrow and Kurker's right to specific performance.

mission offices and inspected Kurker's papers, including plans and proposal for a two-story, 2,300 square foot building on the land right below and to the east of the restaurant, rather than in the area near the parking lot. That evening, Bornstein called Butler and complained vehemently about the location of the building. The two agreed to meet with Kurker the following day at the site. At that meeting Bornstein accused Kurker of misleading him about the proposed building. Bornstein repudiated the agreement and warned that he would fight Kurker's efforts to secure the property, that litigation costs could be substantial, that litigation would consume years, and that the documents were unenforceable. After the meeting, Bornstein actively opposed Kurker's development plans for the marina. The parties have stipulated that Kurker was ready, willing, and able to perform under either the final OTP or the purchase and sale agreement. Bornstein declined to honor either.

2. *Proceedings below.* As relevant to this appeal, Kurker's claims in this action are for (1) breach of contract by the partnership; (2) breach of the implied covenant of good faith and fair dealing by the partnership and the corporation; (3) violation of G. L. c. 93A, § 11, by the three defendants; (4) declaratory relief as between himself and all three defendants under the final OTP as well as the purchase and sale agreement; and (5) specific performance of the final OTP or the purchase and sale agreement.

By way of answer and counterclaims, the defendants admitted the existence of the final OTP and the purchase and sale agreement, but the partnership claimed (1) material misrepresentation by Kurker, resulting in the partnership's right to rescind the agreement with Kurker; (2) damages for the partnership because Kurker caused Kelleher to terminate his agreement with the partnership; (3) violation of G. L. c. 93A, §§ 2 and 11, by Kurker, with the request that (4) the court declare the final OTP and the purchase and sale agreement void, and thereby rescind them.

At the parties' request, the trial was bifurcated. Phase one addressed whether there was a specifically enforceable agreement between the parties and whether either side violated G. L. c. 93A, and is the subject of this appeal. On the contract ques-

tion, the judge meticulously examined the course of dealing between Kurker and Bornstein (noting both individuals as sophisticated in these types of real estate matters), reviewed Massachusetts case law, and made the following findings: (a) "that the [final] OTP constituted an agreement by Bornstein and Kurker on the material terms of the sale of Parcel B to Kurker for $2 million and that it reflects their intention to be bound by that agreement, subject to the execution of a [purchase and sale agreement]"; (b) that the easement self-help language in the purchase and sale agreement was unresolved because Kelleher never assented to it; (c) that the terms of escrow, unfulfilled, meant that the purchase and sale agreement had not been executed by Bornstein; and (d) that "the parties had agreed that the [purchase and sale agreement] shall be the agreement." On the basis of these findings, the judge ruled that Kurker, lacking an enforceable purchase and sale agreement, could not have specific performance.

The judge rejected Bornstein's claim against Kurker for misrepresentation and violation of G. L. c. 93A, § 11, and denied Kurker's remaining claims (interference with contract rights, unfair dealing, and violation of G. L. c. 93A, § 11), because they depended upon an enforceable contract, a proposition that the judge had rejected. Judgment was entered declaring the final OTP and purchase and sale agreement void and unenforceable by reason of the failure of a condition subsequent to the OTP and a condition precedent to the purchase and sale agreement, i.e., the agreement of a third party (Kelleher) to the terms of the view easement on Parcel B.

3. *A specifically enforceable agreement.* The judge's ruling that the final OTP was void and insufficient to support specific performance is error. That ruling depends upon the validity of his finding that the parties, in executing the final OTP, intended that it be subject to a condition, that is, the execution of a purchase and sale agreement. The explicit finding that the parties agreed on all material terms and intended to be bound by the final OTP is inconsistent with the judge's further statement of condition.[10] This is not a case, like *McCarthy* v. *Tobin*, 429 Mass. 84, 88 (1999), where the OTP provided that the parties'

---

[10]For a discussion of the distinction between condition subsequent and

obligations to each other would be extinguished without the execution of a subsequent purchase and sale agreement. Here there are no subsidiary findings or evidence to support the judge's conclusion that the parties had agreed to a condition, and indeed, the nondocumentary evidence is to the contrary. The only evidence in the record related to a condition appears in the final OTP, as follows:

> "The parties hereto shall, on or before 6:30 P.M. with in [sic] 10 days from the date of this signing execute a Purchase and Sale Agreement, which when executed, shall be the Agreement between the parties."[11]

Citation to *Situation Mgmt. Sys., Inc.* v. *Malouf, Inc.*, 430 Mass. 875, 878 (2000), and *McCarthy* v. *Tobin*, 429 Mass. at 88, as authority for the judge's conclusion that the parties agreed that the final OTP would be conditioned, for its effectiveness, upon the execution of a purchase and sale agreement is not helpful. The decision in *Situation Mgmt Sys., Inc., supra*, supports the finding that the parties' final OTP constituted an agreement on all material terms of the sale and reflected their intention to be bound by that agreement, notwithstanding some expression that a purchase and sale agreement would be executed. We find no authority in that case that minimizes the correctness of the judge's finding of "material terms" and the parties' intention to be bound, and no authority to support the conclusion that the language in the final OTP regarding a purchase and sale agreement be, or could be, interpreted as making the otherwise binding final OTP conditioned upon a subsequent purchase and sale agreement. See *id.* at 880, quoting from *Rosenfield* v. *United States Trust Co.*, 290 Mass. 210, 216 (1935) ("if 'all the material terms . . . have been agreed upon, it may be inferred that the writing to be drafted and delivered is a mere memorial of the contract' ").

---

condition precedent, as well as the reason for simply labeling either as "a condition," see *Haverhill* v. *George Brox, Inc.*, 47 Mass. App. Ct. 717, 719-720, 723 (1999).

[11]The final OTP also contained the phrase "[t]ime is of the essence hereof," but the judge correctly determined that the timeliness of the purchase and sale execution was not an issue because it was waived by the parties through their continuing contact and activities with respect to the purchase and sale agreement. See *McCarthy* v. *Tobin*, 429 Mass. at 88-89.

In *McCarthy* v. *Tobin*, 429 Mass. at 85, the offer to purchase required that "the parties 'shall, on or before [a date certain, seven days from the execution of the OTP] execute [a standard form of purchase and sale agreement] . . . which, when executed, shall be the agreement between the parties hereto[,]' [and] [i]n the section containing additional terms and conditions, a typewritten insertion state[d], 'Subject to a Purchase and Sale Agreement satisfactory to Buyer and Seller.' " The court stated that "[e]ven though the purchase and sale agreement was not necessary to bind the parties, its execution was required by the OTP," and that the parties' agreement was "unambiguous in this regard and thus must be enforced." *Id.* at 88. The court reiterated the principle that "[t]he controlling fact is the intention of the parties," *id.* at 87, noting that "the OTP provides that the parties' obligations to each other are extinguished" without an executed purchase and sale agreement by the date certain. *Id.* at 88. The trial judge in this case considered *McCarthy* v. *Tobin* as controlling the outcome. We conclude, however, to the contrary: *McCarthy* v. *Tobin* does not support the judge's denial of the requested specific performance based upon the final OTP. Quite simply, Bornstein and Kurker did not agree that their final OTP would be extinguished by the nonexecution of the purchase and sale agreement, and the judge's findings, examined with the documentary evidence, do not permit that conclusion. The only facts found by the judge in this regard show that both sides proceeded unconditionally and "full steam ahead" on their respective interests in the OTP by ordering plans and immediately engaging professionals for the design features and the closing of the transaction.

We also note that the holding in *McCarthy* v. *Tobin* is directed to a determination of waiver by the seller of the time limitations in the offer to purchase.[12] *Id.* at 88-89. The court's discussion of conditions subsequent is dictum. See *id.* at 88. We hold that the agreement of Kurker and Bornstein, as evidenced by the documentary evidence, does not support the judge's conclusion

---

[12]The court held that the attorneys' actions in continuing to negotiate and exchange draft purchase and sale agreements beyond the date formally set for execution in the offer to purchase constituted a waiver of date certain, as matter of law. *McCarthy* v. *Tobin*, 429 Mass. at 88-89.

that the execution of a purchase and sale agreement was a condition to the enforceability of the final OTP.

We also hold that the plaintiff would be entitled to specific performance of the final OTP even if, hypothetically, the execution of a purchase and sale agreement were a condition to the enforceability of the final OTP. The only unfinished business between Bornstein, as seller, and Kurker, as buyer, under the purchase and sale agreement was the assent of Kelleher to certain language of self-help with regard to the view easement. See note 8, *supra*. The proposed language was acceptable to Kelleher's attorney, who was intending to recommend it to his client at the time, very coincidentally, that Kelleher withdrew from his purchase and sale agreement with Bornstein on the basis of a financing contingency clause. Kelleher had withdrawn. The pursuit of his agreement to the terms of the self-help clause would have been meaningless — a futile gesture — and pursuit of futile matters is not favored in our law, and we have found no authority to the contrary. See *Shemeth* v. *Selectmen of Holden*, 317 Mass. 278, 281 (1944) ("The court would not command the respondents to perform the futile act of issuing a permit which they had no power to issue"); *Jordan* v. *Lavin*, 319 Mass. 362, 366 (1946) ("Unless a chattel could ultimately be seized on the execution, and sold, it would be futile and therefore legally impossible to attach it by trustee process"); *Smith* v. *Gentilotti*, 371 Mass. 839, 840 (1977) (presentment of check to bank was entirely excused as futile gesture); *Commonwealth* v. *Stroud*, 375 Mass. 265, 271 (1978) (judge was not required to formally excuse jury, where to do so would be futile gesture in the circumstances); *Aliberti* v. *Green*, 6 Mass. App. Ct. 41, 45 n.3 (1978) (condition precedent for demand upon corporate directors, under Mass.R. Civ.P. 23.1, 365 Mass. 768 [1974], excused as futile gesture); *Cote* v. *Levine*, 52 Mass. App. Ct. 435, 440-442 (2001) (demand upon corporate board excused as futile). Were we to hold that the absence of Kelleher's assent in this case abrogated the binding nature of the final OTP, we would open such transactions to mischief, by which one lately recalcitrant party could unilaterally derail a contract, otherwise recognized by our law as competent for enforcement.

There was nothing remaining for Kurker to do in order to fulfil whatever obligations he had under the terms of the escrow. Once Kelleher withdrew from the transaction, the escrow was satisfied, and the purchase and sale agreement should have been considered executed, and complete, as of that time and date.

4. *Cross appeal.* In his cross appeal, Bornstein asserts that the judge erred in rejecting his G. L. c. 93A claim against Kurker. The judge's finding that there was no actionable misrepresentation by Kurker is supported, and there was no error.

5. *Conclusion.* Those portions of the judgment dated December 30, 2005, on counts I, III, IV, V, and VIII of the complaint, and counts I, II, III, and IV of the counterclaim are affirmed. Those portions of the judgment on count VII of the complaint, and count V of the counterclaim, declaring that the offer to purchase dated March 23, 2002, is void and unenforceable are modified to provide that the offer to purchase is enforceable and that Kurker is entitled to specific performance thereof. The portions of the judgment on count II (breach of the covenant of good faith and fair dealing) and count VI (violations of G. L. c. 93A) of the complaint are vacated, and the case is remanded to the Superior Court for further proceedings on Kurker's remaining claims.

*So ordered.*