GIOVANNA PASQUALE & others[1] vs. ALFONSO CASALE
& others.[2]

No. 07-P-455.

Middlesex. April 4, 2008. - September 30, 2008.

Present: GRAHAM, DREBEN, & WOLOHOJIAN, JJ.

Contract, Performance and breach. Damages, Breach of fiduciary duty, Breach
    of contract. Attorney at Law, Attorney-client relationship. Privileged
    Communication. Evidence, Cumulative evidence, Relevancy and material-
    ity, Privileged communication.

In a civil action alleging breach of contract and breach of fiduciary duty aris-
    ing out of a pottery making and distributing venture, the judge, in fashion-
    ing a remedy, did not inappropriately authorize a buyout of one plaintiff's
    shares of stock in the venture, but rather imposed a remedy, based on the
    retained earnings of the venture, that gave the plaintiffs, as nearly as pos-
    sible, the value of their rights, as of the time of the breach, under a manage-
    ment agreement that the parties had executed. [735-737]
In a civil action, the evidence fully supported the jury's answers to special
    questions. [737]
The judge in a civil action did not err in excluding from evidence a certain
    communication, where the attorney-client privilege outweighed the proba-
    tive value of the evidence. [737]
This court declined to consider certain arguments raised for the first time on
    appeal. [737-738]

CIVIL ACTION commenced in the Superior Court Department on
March 15, 2002.

The case was tried before Raymond J. Brassard, J., and post-
trial motions were heard by him.

Thomas P. Campbell, III, for Telcom SpA.

Ian Crawford for the plaintiffs.

DREBEN, J. In 1996, Giovanna Pasquale and Telcom SpA (Tel-
com Italy) became the two shareholders of Telcom USA, Inc.
(Telcom USA), and Daniele La Posta, Pasquale's husband,

[1]Daniele La Posta and Pottery Collaborative, Inc.

[2]Telcom SpA, an Italian corporation, and Telcom USA, Inc.

became its president. A few months after La Posta was terminated in December, 2001, as president of Telcom USA by Telcom Italy, La Posta, Pasquale, and their separate company Pottery Collaborative, Inc. (PC), brought this action alleging, inter alia, breach of contract and breach of fiduciary duty by Telcom Italy, Telcom USA, and Alfonso Casale, the principal of Telcom Italy. Telcom USA filed counterclaims alleging breach of fiduciary duties by La Posta, Pasquale, and PC. At the judge's suggestion, and with extensive participation by counsel, ten questions were submitted to the jury, the judge deferring until later consideration the remedies to be imposed. Before entering judgment, the judge held several extensive posttrial nonevidentiary hearings to determine the appropriate remedy in light of the jury's findings.

This appeal is by Telcom Italy from the judgment awarding damages and equitable relief to La Posta and Pasquale after the jury's finding of a breach of contract by Telcom Italy.[3] Telcom Italy's main claims are that the remedy is an improper buyout in view of the jury's finding that Telcom Italy did not breach its fiduciary duty by freezing Pasquale out and that the jury's answers were without supporting evidence. We affirm, as the evidence fully supported the jury's findings, and we see no abuse of discretion in the remedy chosen by the judge after careful consideration of the difficulties in fashioning a remedy in this matter.

1. *Facts and jury findings.* Before discussing the jury's answers to the special questions, we set forth some of the evidence (there was more) supporting their answers. Starting in 1992, PC, with La Posta as managing officer and director and Pasquale as director and sole stockholder, imported and distributed flower pots made out of terra cotta and other materials, including plastic "injection-molded" pots. To expand its product line, PC began to sell plastic "rotational-molded" pots purchased from Telcom Italy and obtained the exclusive rights to import and distribute such pots throughout the United States and Canada. Between 1994 and 1996, PC's volume of sales of Telcom Italy's rotational-molded products totaled approximately $2 million.

[3]No appeal has been prosecuted by Casale. The parties stipulated to the dismissal of Telcom USA's appeal. Judgment entered for the plaintiffs on the counterclaims.

In 1996, after extensive negotiations with Casale, La Posta and Pasquale entered into a flower pot venture with Telcom Italy. The plan was for a separate company, Telcom USA, which was to be owned equally by Telcom Italy and Pasquale, to manufacture and distribute its own rotationally-molded plastic products in the North American market. La Posta was to manage the company as its president. Casale became concerned with this arrangement and sought a slight majority of shares to create a balance of power in view of the agreement that La Posta would manage Telcom USA. Pasquale was to acquire 49.5% of the stock and Telcom Italy would own 50.5%. Pasquale was in accord provided "they" (she and La Posta) were to manage the business. La Posta and Telcom USA executed a written employment agreement containing a severe penalty clause. It provided that Telcom USA would pay La Posta two percent of its sales from all its ventures for ten years if his employment was terminated, but such payments would stop if he competed "directly or indirectly" with Telcom USA after his employment ceased.

Telcom Italy invested slightly more than $250,000 for 204 shares of Telcom USA stock, and Pasquale invested slightly less than $250,000 for 200 shares. At the same time, an agreement for exclusive territories was signed between Telcom USA and Telcom Italy giving Telcom USA "sole and exclusive right to manufacture, develop, distribute and sell rotational molded products and merchandise in and within the United States, Mexico and Canada and their respective territories," while Telcom Italy would have such rights in the rest of the world.[4] It was understood that La Posta would continue to act as president of PC. In addition to Pasquale's original investment, La Posta and Pasquale personally guaranteed millions of dollars in financing for Telcom USA (as did Casale and his wife). Pasquale also lent Telcom USA more than $376,000 (as did the Casales).

PC gave Telcom USA the use of its office rent-free for approximately eight to ten months, and La Posta did not receive any compensation from Telcom USA for the first year. For eighteen months PC and Telcom USA shared PC's office. In

---

[4] A resolution of Telcom USA's board of directors authorized the issuance of stock in these amounts, the employment agreement, and the agreement that Telcom USA would only sell rotational-molded products in North America.

June, 1997, Telcom USA needed more space, and both companies moved to Lawrence. At about the same time, Telcom USA (by Telcom Italy) and PC (by La Posta) executed a memorandum of understanding (MOU) which provided that the two companies would share facilities and personnel but would maintain their separate identities, and that "[n]either company nor their executives will undertake any course of action which would undermine the independence of the other nor interfere with their legitimate business objectives." At the time of the MOU, the only business objective of Telcom USA was to make and distribute *rotational-molded products* and the business objective of PC was to continue to sell terra cotta flowerpots, machine-made and handmade *injection-molded flowerpots*, wrought iron, and glazed flowerpots. La Posta understood that PC could no longer sell rotational-molded products but that it could continue to sell injection-molded products as it had in the past.[5] He considered that Telcom USA could not and would not sell injection-molded products. The companies operated under one roof, sharing personnel and showroom space. The sales managers for the two companies traveled and called on customers together, offering different, but complementary, products. Under La Posta's stewardship, the company grew from ten employees to approximately 170, and from $0 in sales in 1996 to approximately $20 million in sales in 2001.

In September, 2000, Casale mentioned to La Posta that Telcom Italy was taking steps to produce thin-wall injection flower pots, and in March, 2001, he asked La Posta if La Posta would, through PC, import thin-wall injection products of Telcom Italy in place of the products Casale knew PC was distributing from Italy. La Posta declined. By June, 2001, Casale and La Posta also had other differences. La Posta wanted Telcom USA to take in another investor rather than continue with bank financing.[6] Also, in June, 2001, Casale, by electronic mail message (e-mail), accused La Posta of improperly taking a corporate opportunity away from Telcom USA and giving it to PC by selling

[5] PC gave Telcom USA (presumably in 1996-1997) all the market for rotational products that PC had developed in 1994 and 1995.

[6] La Posta's estimate of the company's value, as told to prospective investors in the summer of 2001, and also as of December, 2001, was $14 million.

to Hines Nurseries, a nursery that Telcom USA had also sought as a customer. The sales were of injection-molded products, and La Posta sent Casale a reply indicating that such sales by PC were in accordance with the MOU.

As a result of the deteriorating relationship between La Posta and Casale, in September, 2001, Casale called for a special meeting of Telcom USA's board of directors to be held by telephone. La Posta and Pasquale did not attend because La Posta considered the meeting too important to discuss by telephone. He and Casale had had many e-mail and telephonic communications, and La Posta considered a face-to-face meeting essential. The meeting was held without La Posta and Pasquale, and Casale unilaterally directed that his brother-in-law be added to the board of directors. Prior thereto, the board consisted of four directors: Casale and his son, and La Posta and Pasquale. At the September, 2001 meeting, the directors voted to create an executive committee, with Casale as chair, to which they delegated all of the duties of the board. They also created the position of controller, to whom all other corporate officers, including La Posta, would be subordinate. After he learned of the votes, La Posta became concerned about how to get his and Pasquale's equity out of the company. He asked for a buyout.

Although La Posta did not resign, on December 18, 2001, Casale, on behalf of the executive committee, wrote to La Posta saying that the committee "accepts your resignation as President of Telcom USA." Because the termination was couched as a resignation, La Posta understood he would not receive any severance pay and that he was free to compete.

Pasquale continued as a director of Telcom USA until 2004. For the years 2001 through 2003, Pasquale did not receive any director's fees, although each of the other directors received $15,000 annually. Telcom USA did not distribute any dividends except once in 2002 for 2001 earnings, despite a 1997 agreement providing that unless there was unanimous consent of the shareholders, at least fifty percent of the net profits would be distributed each year.[7] La Posta also did not receive a bonus to which he was entitled for the year 2001.

[7]While La Posta was president, the shareholders appeared to have agreed that Telcom USA would retain all earnings.

The complaint in this action was filed on March 15, 2002, and amended in January, 2005. After twelve days of trial, the jury answered the special questions posed to them as follows:

1. La Posta, Pasquale, and Telcom Italy agreed "that Mr. La Posta and Ms. Pasquale would retain management control of Telcom USA."

2. Telcom Italy committed a breach of the agreement.

3. Telcom Italy's breach was not "justified by a breach of fiduciary duty owed to Telcom USA by Daniele La Posta."

4. La Posta did not "breach any fiduciary duty to Telcom USA with respect to Hines Nurseries."

5. After he was terminated from Telcom USA, La Posta competed with Telcom USA with rotationally-molded plastic products beginning in January, 2002.

6. Telcom Italy committed a breach of its fiduciary duty to Pasquale by preventing her from receiving a dividend payment in 2002.

7. Telcom Italy committed a breach of its fiduciary duty to Pasquale by preventing her from receiving director's fees for the years 2001, 2002, and 2003.

8. Telcom Italy did not breach its fiduciary duty to Pasquale by freezing her out of Telcom USA.

9. Pasquale did not breach any fiduciary duty to Telcom USA.

10. La Posta did not breach any fiduciary duty to Telcom USA.

2. *Judgment.* The judge held three extensive hearings after the jury's answers, noting that the "matters are all close and difficult." The defendants sought a judgment notwithstanding the verdict as to question 4, and Telcom Italy argues on appeal that no rational jury could have come out as they did. The judge ruled, we consider correctly, that the jury's answer was not irrational and was supported by the evidence based on the agreements of the two firms which set forth the division between injection-molded pots and rotational-molded pots.[8]

Based on the jury's answers, and after indicating to counsel the substance of what he would do, the judge issued a judgment that ordered, inter alia, the following:

---

[8]We also consider, based on the evidence at trial, that Telcom Italy's other challenges to the jury's answers are without merit.

1. To Pasquale on count I of the amended complaint (breach of fiduciary duty against Telcom Italy), a dividend of $170,280 owed as of July 15, 2003, with prejudgment statutory interest of $40,867.20 and director's fees of $45,000 ($15,000 owed as of July 15, 2002, 2003, and 2004, respectively), with statutory interest of $10,800.

2. To La Posta on count IV of the amended complaint (breach of contract by Telcom USA), a bonus of $18,760.02 owed as of March 12, 2002, with statutory interest of $7,504.

3. To Pasquale and La Posta jointly on Counts II and III of the amended complaint against Telcom Italy (breach of the 1996 management agreement and breach of the covenant of good faith and fair dealing of the 1996 agreement), $2,436,041.47, calculated as follows:

a. stock repurchase (no prejudgment interest): $247,500;

b. repayment of a demand note dated October 28, 1999, in the principal amount of $377,190, plus unpaid interest of 7.25% for one year: $404,536.27;

c. 49.5% of the retained earnings of Telcom USA as of December 31, 2001 (no prejudgment interest): $1,784,005.20.

The amount awarded against Telcom Italy in paragraph 3(c) was to be reduced by the principal, but not the interest, of the amounts listed in paragraphs 1 and 2 ($170,280, $45,000, and $18,760.02, respectively, for a total of $234,040.02) should Telcom USA pay the judgment set forth in paragraphs 1 and 2.[9]

3. *Contentions on appeal.* Telcom Italy's primary challenge on appeal is directed to paragraph 3 of the judgment.[10] It claims that the judge erred in authorizing a buyout of Pasquale's shares in view of the jury's finding that she was not frozen out. The difficulty with this argument is that the judge specifically declined to order a buyout although the plaintiffs had requested that remedy. Despite the fact that the remedy included a repurchase of stock, we agree with the judge's conclusion that the remedy he chose was not a buyout but rather a remedy that gave the

[9]The judgment also contained provisions relating to legal fees and steps to be taken to eliminate the plaintiffs from their obligations as guarantors for the bank financing. These provisions are not contested on appeal.

[10]Since the judgment directly imposed liability on Telcom Italy, the plaintiffs' claim that it has no standing is devoid of merit.

plaintiffs as nearly as possible the value of their rights under the management agreement as of the time of the breach. See *Anthony's Pier Four, Inc.* v. *HBC Assocs.*, 411 Mass. 451, 478-479 (1991). The retained earnings, upon which the judgment was based, did not represent the value of the company,[11] but rather were what the judge termed the "sum total of the profits made since the inception of the company."[12] Thus the amount awarded under paragraph 3(c) to Pasquale represents 49.5% of the net profits earned by the company from 1996 through December, 2001, less the one dividend paid in 2002. See note 12, *supra.* "An award of 'expectancy' damages may include lost profits." *Situation Mgmt. Sys., Inc.* v. *Malouf, Inc.*, 430 Mass. 875, 880 (2000). The judge was within his discretion in determining that 49.5% of retained earnings, together with the sums invested in and lent to Telcom USA, represented a reasonable approximation of the value of the plaintiffs' rights under the management agreement as of the date of the breach, or put in another way, the amount represented the plaintiffs' reasonable expectations of benefits from their management agreement. To effect this remedy, a return of the stock was necessary, as were orders requiring the defendants to have the plaintiffs removed as guarantors on loans to Telcom USA. That a remedy which is partly damages and partly equitable may not be the usual one for a breach of contract, does not preclude its application when needed to achieve a result balancing fairly the rights of both parties.[13] See *Nile* v. *Nile*, 432 Mass. 390, 401-402 (2000). See also Mass.R.Civ.P. 8(a)(2), 365 Mass. 749 (1974), which permits

---

[11]Indeed the only evidence of the value of Telcom USA was far in excess of the amount awarded. La Posta's estimate of the company's value was $14 million, and he testified that Casale thought it was worth more. See note 6, *supra.*

[12]An examination of the balance sheets of Telcom USA indicates that the retained earnings shown each year represent the cumulative net profits less dividends paid. (The only dividend paid in the relevant period was in 2002 for 2001 earnings.) Thus in 1998 the retained earnings were $217,368, and in 1999, the net income was $1,441,087, which, when added to the $217,368, results in retained earnings of $1,658,455 at the end of 1999 as shown on the balance sheet for that year. The figures for 2001, $3,604,051, and 2002, $4,687,837, likewise confirm that retained earnings represent the cumulative net income over the years less amounts paid as dividends. The record on appeal does not appear to contain the figures for 2000.

[13]The judge noted that La Posta and Pasquale were denied the benefits of

a litigant to seek and, a fortiori, a judge to grant, several different types of relief.

Since the measure of damages was not the value of the stock, Telcom Italy's claim that the judge erred by not reducing by a lack of marketability discount the shares held by Pasquale, a minority shareholder, is without basis. Also without basis is the claim that the "the buy-out remedy" awarded the plaintiffs considerably more than they would have been entitled to receive if none of the alleged majority shareholder misconduct had occurred.

4. *Other issues.* Many of the remaining contentions of Telcom Italy depend on its view of the evidence, contrary to the jury's findings, that the plaintiffs had acted in derogation of their fiduciary duties and that the termination of La Posta and the failure to give Pasquale director's fees was justified because of their breaches of such duties.[14] The claim that La Posta's rights were limited by his employment contract ignores the jury's finding that there was not only an employment agreement, but also an agreement that La Posta and Pasquale would retain management control. As we have indicated earlier, the evidence fully supported the jury's answers; hence the claims of Telcom Italy based on its view of the facts are without merit.

Telcom Italy also contends that an e-mail excluded by the judge on the ground of attorney-client privilege was critical. As the judge noted, the relevance of the e-mail was that La Posta was endeavoring to put some pressure on his partner, and that fact "is fairly in the evidence in all events, and I think its probative value here, such as it is, is certainly significantly outweighed by the privilege." We see no error in the exclusion.

In its reply brief Telcom Italy raises certain arguments not

---

the management agreement that had been breached, and that his (the judge's) task was to determine how to properly award damages for the breach. "Just awarding some of the direct out of pockets, the dividends, the bonus, directors fees, even when added on to by components like the cost of the stock and the loans made by a shareholder, that does not fundamentally speak to a value that the company built up over several years, that the plaintiffs would get nothing for. I just cannot rest comfortably that that would be a fair remedy from a court of law."

[14]The amounts of the director's fees, the bonus, and the dividend were not in contention. What was in contention was whether the plaintiffs should receive them.

raised in its original brief. "Any issue raised for the first time in an appellant's reply brief comes too late, and we do not consider it." *Assessors of Boston* v. *Ogden Suffolk Downs, Inc.*, 398 Mass. 604, 608 n.3 (1986).

5. *Conclusion.* After a review of the evidence and the post-trial hearings, we conclude that the remedy fashioned by the trial judge was within his discretion.

*Judgment affirmed.*